The last case this afternoon is 419-0274, Winneburg, if that's pronounced correctly, v. Roth et al. As you see, there are just two of us here, and I regret to say that Justice Connett is not able to be present for this afternoon's oral argument. However, he will be a participant in the resolution of this case. He will be listening to the recording of the oral argument. So that's not an amplifier, but it's a recording device. Be sure to speak so it will be clear for him to be able to hear. And we all regret that he's not able to be here, but we will proceed anyway since here you all are. Also, I want to mention, we ask for everyone to be present a half hour early in case we are able to start early. You are here. We're able to do it. So I want to thank you for that so we can get going and appreciate your courtesy in doing it. Anyway, going to the case number four for the appellant is Mr. Turpin, and for the appellee is Mr. Sherver. Is that pronounced correctly, sir? Sher, yes. Sher? Yes. Okay, and Mr. Yao? Yes, Your Honor. Pronounced correctly? Correct. Okay, and you'll each be arguing and you've given your time to the clerk? Yes, Your Honor. Okay. Mr. Turpin, you may proceed, sir. Thank you. Good afternoon, Your Honors. I would like to start with discussing the first issue raised in the briefs, and that is the dismissal of count two of the First Amendment complaint. First of all, there are several reasons that were given by the trial judge for dismissing count two. The first issue on that was the supposed lack of Mr. Sher to enter a settlement in the Property Tax Appeal Board, or PTAB, case. Calhoun County appointed Mr. Sher as Special Assistant State's Attorney to handle that case in the PTAB. There is no dispute that an Assistant State's Attorney has the same authority in court as does the State's Attorney, and there's also no dispute that the State's Attorney's Office has the exclusive authority to settle tax cases. And there should be no dispute that Special Assistant State's Attorney has authority to settle a PTAB case because the PTAB regulations provides specifically that a specially appointed Assistant State's Attorney can appear in a PTAB hearing on behalf of the county officials, and they also provide that the parties may enter into settlement agreements. So there is really no way that Mr. Sher was not authorized to enter a settlement agreement in this case. In fact, the PTAB indicated that it felt that Mr. Sher was authorized to enter a settlement pretty much for all years, but that they couldn't enforce it against Calhoun County because they thought that Calhoun County had to sign off on it. Judge Adrian indicated that he certainly was authorized to settle for 2010, but not for future cases, and the reason that he gave for that was that it would be unfair to the taxing districts who weren't there because they wouldn't know that there were other years besides 2010 that could possibly be settled. But those taxing districts chose not to intervene like Calhoun County did. But more importantly, the case law is pretty well universal that the State's Attorney, or Assistant State's Attorney in this case, can settle tax cases without notice to or approval of any of the tax districts. So whenever there's a settlement, the State's Attorney has the authority to enter the settlement agreement without any input from the taxing districts. So if no notice is required to settle for one year, why should it be required to settle for multiple years? In fact, the appellate court in the Tazewell County v. PTAB case specifically said that multiple-year settlements would be good in that they avoid duplicating the evidence that has to be presented, and it helps to essentially just streamline litigation and not waste judicial resources. As these other gentlemen here know, these property tax cases go on a year-to-year basis. Every year you go to the Board of Review. Every year you file a tax objection complaint. Why would we not want to allow the avoiding of the duplication of all that and going to court so many times and spending all the time and money if we can get a settlement that is agreed to by all the parties? So for those reasons, Your Honors, clearly there was authority to settle for more than one year. As far as the consideration issue, the trial judge kind of threw us a little bit of a curveball on that one. Nobody had really raised this issue. Nobody had argued it. But this one seems pretty simple. When the party that brings the suit agrees to cease the litigation in lieu of the settlement agreement, that is the consideration. The mutual promises that are given from each side and the ceasing of the litigation, that is the consideration. It's basically as simple as that, and that's what happened here. All the documents and transcripts that appear in the record clearly show that the parties put the settlement agreement on the record. The PTAB hearing was brought to an end. The administrative law judge gave us some instructions to file stipulations and whatnot. All of that was done, and then it was that Calhoun County decided to back out of the agreement. So clearly there was consideration for this settlement agreement. With respect to collateral estoppel, obviously a little bit more complicated issue, but there are several elements for collateral estoppel to apply, and I would submit, Your Honors, that those elements certainly were not met in this case. First of all, there was no identity of issues. The issues in the motion to enforce the agreement in the PTAB and the cause of action for enforcement in the Calhoun County Case 14-TX7  When you file a motion during a pending case to enforce a settlement agreement that was reached during that case, the elements that you have to prove are the liability of the other party, the agreement concerning the amount to be paid, and the acceptance of the agreement in settlement of the original dispute. That's what you have to prove when you file a motion to enforce during the pending case. On the contrary, when you later file a suit to enforce the settlement agreement, which is basically a suit for breach of contract, you have to prove the existence of the contract, performance by the plaintiff, breach of the contract by the defendant, and damages as a result. Pretty much the standard elements that you have to prove in any breach of contract case. So the two issues from the PTAB and Count 2 of the First Amendment Complaint are not the same because they require proof of different facts. So for that reason, the issues are not identical, as would be required for collateral estoppel to apply. Is it the elements you're indicating are the same or is it the issue? Well, I guess it kind of boils down to how do you define the issue. And that might be a pretty important question. But the issue when you file a motion to enforce in a pending case is the issue that the trial judge has to decide is, okay, am I going to stop this litigation and not let anybody present any more evidence and say, okay, we're done? That's the issue there. The issue in a suit for a breach of contract is, okay, was there a contract, did somebody breach it, and is someone entitled to damages? So it's not a matter of stopping the litigation and telling everybody, okay, you have to do what you said in front of me a few minutes ago that you were going to do. That's when you file a motion. But in a lawsuit, that presents all different elements of proof. That's a different issue. So there would not be identity of issues from the PTAB to the trial court in a later case. There was also no final judgment. In a property tax appeal board, again, we filed a motion to enforce a settlement judgment or settlement agreement, and that was denied. But case law indicates that a motion to enforce a settlement agreement during the pendency of a case is analogous to and should be treated the same as a motion for summary judgment. The denial of a motion for summary judgment is not final, and for that reason it cannot be the basis of collateral estoppel. And it would make sense to apply that to a motion for enforcement of a settlement agreement because the result is the same in either instance, whether it's granted or denied. If it's granted, then the case is over and we know who, not necessarily who wins, but we know what the outcome is right there. If it's denied, then the court says, no, there's no settlement agreement, and we go ahead and proceed on. Exactly same thing in a motion for summary judgment. If a summary judgment is granted, the case is over with, that's a final disposition, everybody goes home. If it's denied, then everybody continues on with the case. So these two proceedings, if you will, are analogous. They should be treated the same. And since there was a denial of the motion to enforce a settlement agreement, just like a motion for summary judgment, the denial is not a final judgment and cannot be the basis of collateral estoppel. In fact, cases even say that the denial of a motion for summary judgment can't even be raised on appeal because it is an interlocutory judgment that doesn't dispose of the case. Of course, if there were opposing motions for summary judgment, one of them is granted, one of them is denied, then that's a horse of a different color. But that's not what we have here. Additionally, the denial of the motion to enforce was not essential to the final judgment. The settlement agreement concerned multiple years, 2010 plus years following and years into the future. The final PTAB decision only concerned tax year 2010. There was only evidence heard on tax year 2010. There was no ruling made on anything other than tax year 2010. So the denial of the settlement agreement really had nothing to do with the actual final decision that was rendered by the PTAB on that particular tax year. As far as the trial court's ruling on the meat of the issue, the assessment classification, the judge ruled that all 84 parcels out here were to be assessed as residential, which is kind of curious if you think about it because when my client purchased the property, it had been all assessed as farmland. And even in the 2010 PTAB hearing, the PTAB ruled that all of the parcels that had corn and soybeans growing on them were also to be assessed as farmland. So this ruling actually went back as far the other way as it could have been. But the use of this property, and it's never been disputed, the use of this property has never, ever changed. Now, the defendants have argued before this court and before the trial court that the land was all residential. But even though the plaintiff has the burden of proof, it is a de novo review by the trial court. And even though the standard of proof is clear and convincing evidence, my question is, what evidence is there in this record to show that any of this property, any of these 84 parcels, were ever used for residential purposes? There are no houses. There's nobody living there. Part of it is fields. The other part is steep, brushy timber. No one has ever lived there. There has never been any development other than there's some roads going in and out through it. But there has never been any human habitation, no houses, nothing ever constructed on the property. So the evidence showed that not only what I just said, there's no development, no one's ever lived there, it's been the same ever since not only since my client purchased the property in 2008, but going back to the 70s. The use has never changed. The only thing I think that the defendants can even realistically try to hang their hat on is the fact that there is a presumption that the assessment was done correctly and also the fact that it is platted as a subdivision for some future development sometime, whenever that ever happens. But we rebutted that presumption in trial court, I would submit to your honors, tenfold. With respect to the 14 parcels that had corn and soybeans on them, the testimony and the stipulations established on these parcels for the relevant years that there was either corn or soybeans planted, cultivated, taken out, and sold. And nothing was ever done on any of that property other than that particular use. Again, no development, no buildings, no houses. And this falls squarely within the definition of farm in Section 1-60, which is property used solely for the growing and harvesting of crops, including, but not limited to, grain. Now, the defendants are trying to get out from under this definition in several ways. First of all, they rely on the fact that it wasn't the actual landowner-slash-taxpayer that was doing the work, but it was rented out to a tenant farmer. Well, Section 1-60 doesn't say anything about that situation. It doesn't say that it's only a farm if the landowner is doing the work. It doesn't say it's not a farm if the work is being done by a tenant farmer. So that, as they say in Calvin County, that dog won't hunt. Look, just think about all the thousands and thousands of acres in central Illinois that we drive by every day that are owned by one person, but they are farmed by a tenant farmer who's renting the ground. I think that certainly would be considered farmland, and I'm sure that that land is assessed as such. They also rely on some language in the Publication 122 from the Department of Revenue that has to do with land being in parcel smaller than five acres and there only being conventional farming going on on the property. But the appellate court has actually rejected that specific argument. In the Kankakee Board of Review versus PTAB case that I cited in my brief, they addressed the identical language that was in a different advisory guideline that was put out by the Department of Revenue, but it said the same thing, that it's not to be considered farmland if it's less than five acres and there's only conventional farming going on. And the appellate court clearly ruled that that is not an authorized guideline to be put out by the Department of Revenue because it expands, or you can look at it another way, it limits the definition of what is a farm. Since the statute doesn't say that there's any kind of acreage or activity limitation for what is considered to be a farm, then the Department of Revenue went beyond what it was authorized to do in coming up with that particular guideline. So the size of the parcels and what type of farming is being done is absolutely irrelevant. The trial court ruled that the parcels were not a farm because the crops were planted and harvested to control noxious weeds like Johnson grass. Well, again, Section 1-60, which is our go-to statute for the definition of a farm, doesn't say anything about any purpose or reason for growing and harvesting the crops. It just says if the land is used for growing and harvesting the crops. Did you argue this in the trial level? On the trial council? On that particular issue of the— Because I'm wondering what was the reason. Well, I believe I did. In fact, I'm sure that I did in my final written argument because I think I basically cut and pasted into my brief what I'd argued to the trial court, as I will do sometimes. But, yes, those are the cases and the statutes that I cited, Your Honor, were the same ones that I cited here. And the Section 1-60, I would like to point out, too, also defines farm as including any other agricultural or horticultural use. Well, again, as I've cited in my brief, there are cases that say that control of weeds is, in fact, an agricultural use of the property. So even if we were to determine that the purpose for which crops are grown, harvested, et cetera, is relevant and it needs an agricultural purpose, according to our Illinois Supreme Court, that is actually an agricultural purpose. The trial court and the defendants also have relied on the issue of zoning. The trial court said that since the property is zoned as residential, that's an indication that it should be assessed or classified as residential for the tax assessment purposes. But, again, the appellate court has rejected this as well. The cases I've cited in my brief indicate that regardless of how something is zoned, it is the current use of it that controls whether something gets a farmland classification or not. The cases that I cited, I believe the classification was industrial as opposed to residential. They still said, we don't care what the zoning is. That's a separate issue. What is the current use of the property? That's the only thing that we look at. And so, therefore, the fact that it might be zoned residential has nothing to do with whether it should be classified as residential or farming for tax purposes. And the same is true for the fact that the parcels are marketed for sale, possibly for future residential use. The courts, again, have held that it is the current use, not the future intended use, of the property that controls. In fact, I think Mr. Howard even testified at the trial that if somebody wants to buy one of his lots, he doesn't care what they do with it. If they want to build a house on it, that's fine. If they don't, that's fine, too. If they want to continue to farm it, that's fine. But it is the current use that controls, not what the owner of the subdivision intends to do with it at some future point in time. Now, with respect to the other parcels, the timber parcels, and this would be Deer Trail, Eagle's Nest, and Fox Run, we look to Section 10-125, and it lists four different types of farmland. And those are cropland, permanent pasture, other farmland, and wasteland. And the statute says that these types of farmland shall be defined according to U.S. Census Bureau definitions. Well, Publication 122, on the very first page, gives definitions of these four different types of farmland that are mentioned in Section 10-125. And it indicates that the definitions meet the U.S. Census Bureau definitions per Section 10-125. So these definitions are specifically authorized by the statute, unlike the ones dealing with the five-acre and conventional farming and that stuff. So it defines other farmland as woodland pasture, woodland, including woodlots, and timber tracks. Well, the testimony and the stipulations at the trial level all clearly indicate that these three different areas of the entire subdivision were substantially timber. And it had always been that way. Ken Howard testified that the use of this property had not changed since at least the 70s. So other farmland is by statute farmland. And any track that is timber is by definition considered other farmland. It's probably wasteland too, but I think that since the regulation defines other farmland as including timber, then that's just kind of a no-brainer. So for that reason, obviously these timber tracks in Deer Trail, Eagles Nest, and Fox Run, clearly they're timber, and clearly they are considered other farmland, which is a type of farmland. So for those reasons, the 14 parcels that had crops on them should be assessed and classified as farmland, as should be the remaining timber parcels. Thank you, counsel. Who will speak first, Mr. Scherr? Yes, sir. Then you may proceed, sir. Maple Leafs Court. I'm Chris Scherr. I'm here on behalf of Calvin County State's Attorney, Richard Ringhausen,  And I just want to take a step back from what we're talking about today and look at the larger picture because Mr. Ringhausen and I were here in this court 10 years ago on the initial decision that I believe Justice Connect authored. It was 403 Illinois App 3rd 744. Mr. Ringhausen was in private practice, represented the plaintiff in this case, and filed a complaint for review of assessment slash objection to assessment. And then State's Attorney, Charlie Birch, contacted my office through the appellate prosecutors and asked that we handle the appeal. We briefed it, and one of the issues we raised is that the trial court lacked jurisdiction to consider the issues that were presented with regard to the 2008 tax year. And that's what the appellate opinion did in that case, was dismiss the matter for lack of subject matter jurisdiction. That decision came down in September of 2010. In April of 2011, the plaintiff slash taxpayer in this case filed with the Property Tax Appeal Board with regard to the 2010 tax year. When Mr. Turpin was talking earlier about what the Property Tax Appeal Board did or what the Property Tax Appeal Board found, that's what he was referring to. It was the 2010 tax year. We're here on the 2013 tax year on a tax objection complaint for the 2013 tax year. In the 2010 appeal, there was a hearing that was scheduled. There were some conversations regarding settlement. And as indicated, Mr. Turpin, the plaintiffs in this case, count two of their amended complaint, they were seeking to enforce a settlement agreement. I don't think this court needs to get to the issue of whether there was authority or not authority to enter into a settlement agreement because we're here talking about the 2013 taxes. The settlement agreement that he alleges existed occurred in the context of a 2010 Property Tax Appeal Board hearing. And as indicated in the briefs, there was a motion to enforce that settlement agreement filed with the Property Tax Appeal Board. The Property Tax Appeal Board declined to enforce it. And when Mr. Turpin indicates that this denial was not part of the judgment, I direct the court's attention to the Property Tax Appeal Board's 2010 decision, preliminary decision, which was dated May 20th, 2016, and it appears in the common law record at C730. The Property Tax Appeal Board specifically said that by letter slash order dated May 6th, 2015, the Property Tax Appeal Board denied the appellant's motion to enforce a settlement and scheduled the matter to reconvene, the hearing commencing on September 8th, 2015. Said letter slash order dated May 6th, 2015, by the Property Tax Appeal Board, is hereby adopted and incorporated in full as if set forth in this decision. So my point in telling you all this and giving you the broader history of that is that was the plaintiff's opportunity to pursue review. The plaintiff had the opportunity to pursue administrative review of the Property Tax Appeal Board's decision and the Property Tax Appeal Board's denial of their request to enforce a settlement agreement. There was an attempt at an appeal, and it was docketed with this court as case number 4-16-0456, but the appellate court dismissed that case for lack of jurisdiction. There was also a 2011 tax year Property Tax Appeal with the PTAB, and that case in one form came to this court in docket number 4-17-0495. So this is actually the fourth time that this court has been presented with some of these issues, but yet the first time that the court is dealing with them substantively, because it does have jurisdiction this time around. But the alleged settlement agreement was for 2010, 2011, 2012, and 2013. 2010, the agreement was not effectuated. There was no review of that decision. 2011 tax year, 76 of the 89 parcels were dismissed from the Property Tax Appeal Board's appeal, and a decision was rendered as to 13. Those 13 parcels, after the appellate case was dismissed, went up on administrative review with the circuit court, and that was Calhoun County, case number 18-MR2. The Property Tax Appeal Board's decision was affirmed. There was no further review of that decision. There has been no case implicating the 2012 taxes, so here we are in the 2013 appeal, a tax objection that is the final year of the alleged four-year agreement. So lack of consideration, call it collateral estoppel. They've had their opportunities to review the alleged settlement agreement. They have failed in those efforts. And in all these different variations of review of the assessment of these parcels, they've been the same recycled arguments regarding farmland assessment and other farmland and wasteland and developers' relief exemption under Section 10-30. And they've all been rejected by the Property Tax Appeal Board, by the trial court in 2008, by the Property Tax Appeal Board in 2010 and 2011. And in this case, the trial court judge did something that nobody else had done in the other cases as far as I know. I can't speak to what happened with regard to the 2008 case. But in this particular case, the trial judge made a visit to the site. We have pictures in the record. They were stipulated exhibits U and stipulated exhibit F. Stipulated exhibit U appears at C-553 to C-576. And stipulated exhibit F appears in C-893 to C-904. If you look at the two exhibits, you can guess fairly well who took those pictures. Which side, did the plaintiff's side take the pictures or did the defendant's side take the pictures? So depending on which picture you're looking at, you're getting a different flavor for what the residential area, the development area looked like. In this case, Judge Adrian made a site visit. What year were these pictures? I'm not sure what year the pictures were taken. But they were presented and everybody stipulated them as exhibits in this case. So is this out of the question of whether it was the growing and harvesting of crops? I'm not sure I follow. Is there any question as to whether there was growing and harvesting? Is that what this was the picture we were pertaining to? Well, I think it was more about just to give, well, you'd have to ask the person who took the picture. I don't know the answer to that. But Judge Adrian had an opportunity to spend an afternoon or morning taking the entire flavor of the area. He saw everything through his own lens. We took him wherever we wanted him to go. He was available. He looked at everything that we pointed out. And so he had this unique perspective. And after considering everything, he determined that it's not farm. Farmland assessment is not appropriate. Section 1-60 of the property tax code that counsel pointed out, it says farm includes growing and harvesting a crop. But what was not mentioned was that the statute specifically says that farm does not include property which is primarily used for residential purposes, even though some farm products may be grown on the property incidental to its primary use. How is it used for residential purposes? These individual parcels? Yes. Well, it's in the larger context. Parcels next to them, adjacent to them, in the surrounding areas, houses were built on them. Judge Adrian got to see the swing sets, swimming pools. Isn't the question concerning the tax parcel itself, not the ones next door? Each individual parcel, there needs to be a determination. Correct. Well, then why does it matter what was next door? It builds into the decision as to whether it's primarily residential or not. Well, the growing and harvesting of crops, this seems to be a binary matter. Yes or no? Correct. Were they growing and harvesting crops or were they some dumplings on it? Correct. Absent the sentence I just quoted from Section 1-60, I would say that the analysis ends there. But I see I've run out of time. No, no. I need some clarification. Absolutely. I'm happy to give all the time you'd like. The growing and harvesting of crops. There's two questions. One, were crops being grown and harvested there? And two, were there any residential buildings there on the parcels in issue? I don't think I understand your question. Well, isn't the question here about specific parcels and whether they were properly taxed? Yes. And the claimant says they were taxed as residential lots. Correct. Improperly. He claims that they were essentially being used for the growing and harvesting of crops of whatever nature and that there are buildings on the lots. Do you understand his argument? I understand his argument. Why isn't that correct? Because the farm products were grown, yet incidental to their primary purpose as residential. It seems to me, from my understanding of this case, is that what you're talking about is a future intention in how the property might be used as opposed to how, at the time of the evaluation, it was being used then. Isn't that correct? I think that's a part of it. I think it's the overall flavor and character. But to the extent it is a part of it, isn't that simply wrong? That is, the statute doesn't talk about future intent. It doesn't. The statute talks about right now, doesn't it? Right. So, in what sense were the parcels at issue being used for residential purposes? Well, it's a primary use determination, not just an explicit use determination. Hey, I'm real flexible. Give me any example of how they're being used for residential purposes, whether primary or secondary. On the whole. See, that's a difficult way to begin the answer when I'm asking for an example of how parcels at issue are being used for residential purposes. Surely, if you're claiming that they were properly identified as residential property for tax purposes, you should be able to explain why. The zoning, the restrictive covenants, the character of the neighborhoods. On that point, the character of the neighborhood, meaning the other houses in close proximity, what's your authority to take that consideration and attribute it to be residential? What's the authority that allows you to... We're not talking about subject parcels. We're talking about houses in the area. What's your authority for using that as part of the analysis? Well, again, it's a primary use determination, and I don't think you can look at one single parcel in isolation. I think you have to look at it as a whole. Thank you, Mr. Chair. Your time is up, and we'll hear from Mr. Yelp. Thank you very much. May it please the Court, Counsel. Counsel. I'm Alan Yelp, and I'm here with my associate, Port Brown, and we represent the Brussels School District. We're here to urge the Court to affirm what the trial court did. Ralph, can you pick up on the theme that Justice Kavanaugh and I were just pursuing here about how the parcels at issue manifest themselves as residential? Sure. Well, if we could take the parcels in two bunches, Your Honor. I'm sorry, take the parcels what? In two parts. Okay. We have the 14 tracts that there's testimony that there was crops on them. Okay. But when we look at those tracts and there's photographs in the record, for example, the lots that are across from the country club,  residential-type utilities, all right? And, in fact, right across that road within a stone's throw are residences. All right? So you have utilities there. You also have, and that's on Quarry Road. And then if you look at the photographs that depict deer trail parcels, all right, you'll also see not only street signs there, right there, for even undeveloped road, but you also have the water utilities that are located there. So it's clear that these properties are residential, all right, and part of the larger. I'm a simple kind of guy. Residential to me means there's a building. Someone's got a house or it's in the process of being built, maybe. Sure. But how is it, when you say it's residential and I look and I see crops, I'm having trouble understanding how that works. On those 14 lots, there are no homes. There are no residences. Even if it's been planted out, why does that matter? Well, to go back to what Mr. Scheer indicated, in a sense when you're looking at the entire character of this, the Kankakee case that's cited by opposing counsel. I don't understand the entire character. It seems to me that for purposes of facts assessment, you have to look at this person. You know, it seems to me I've been around a long time and there are lots of country clubs I'm familiar with where I think there's a farm right across the street or nearby or the border up to it. Does that mean that the farm is not farmland? Not necessarily. Not necessarily? You mean it might be? Well, in this context, the plaintiff, Kenneth Howard, who is the sole member of KT Winterberg, he testified as to why he was even allowing these crops to be grown. Because why? He wants to control the weeds because crops look better than weeds. All right? And so from the plaintiff's own admission... Just pausing right there, why does his intent and why he's growing crops matter on the issue of crops being grown? Because it goes to show that those crops being grown are not being grown for an agricultural purpose. They're being grown for a residential commercial purpose. For use in the future. Well, for him trying to sell the lots that are $30,000 to $40,000 or $50,000 apiece that he has listed for. And opposing counsel referenced that the weed control is part of agricultural use. And in his brief, he cites the Illinois Notchess Weed Control Act. All right? But that act is not limited to agricultural purposes. But isn't the issue in taxing the present use of the property as opposed to what the intent might be for using it in the future, maybe even in the near future? I mean, does it account for this taxable year? How is it now being used? I believe that is a factor. All right? But I guess what I would argue is that the use of the property now is being as residential. All right? Yes, there's not a home on it. All right? But it's being treated by the owner as residential property for residential development. You know, English is my mother tongue, counsel. And, you know, words have meanings. And to say it's being used as residential because of what he intends to do with it in the future strips residential meeting on how it's being used now. It's not being used residentially now. Now, it's conceivable, by the way, that the tax code could have provided, if the legislature had so wished, that property being used, property is residential if it's being used for residential purposes or is being in the process of being turned into residential use, which is essentially what you've been arguing to me. But the statute doesn't say that, does it? No, but I think that follows through, though, with the idea of the developer's release statute. But this is what I asked Mr. Scherer about it and for any authority because what we're faced with is language that says the present use, not the intended use or the hopeful use, present use. So if I were to ask you the question, what authority allows us to take into context the signs and utility goals and the intent for selling this property and developing it into residential? What defeats present use? Sure. I don't have the authority that says what defeats present use, but when you look at some of the cases that have been cited, for example, the Kankakee case, one of the things the court looks at, well, let's look at the character of what's going on around it to help make that determination. And here, what we have going on around it are residences. I mean, this is a situation where years ago, in the 1990s, it was first acquired. It was out and open. Maybe there was farming on these parcels. But after that, after that purchase, it's subdivided. It's platted. Streets are put in. Lots are sold. Houses are built. It's clearly a residential development. And that's one reason why, for example, the developer's relief statute doesn't apply here, doesn't help opposing counsel in that matter. The Kankakee case was the decision of the 3rd District Appellate Court. They said it would apply. We're going to have to follow it unless it was well-reasoned. Why shouldn't we follow it? Well, and we argued in our brief that you wouldn't necessarily follow the plaintiff's side of it as authority of somehow dispositive of this case. We indicated in our briefs, however, that one of the reasons why the court in that case found that the land should still be farmland was because of the surrounding character of that land. And what we argue in our case is the negative aspect of that decision. Right, right. We're pointing out the differences here. Here's my question. The statute doesn't refer anywhere, does it, to the surrounding land regarding the parcel to be taxed? Not that I'm aware of, Your Honor. Then why, where does the property tax board or the court or this court get off adding that language to the statute? Well, to argue that context does matter in trying to, in making these ultimate determinations as to what really is this property. You know, I really am in trouble with this whole concept, counsel. You know, it seems to me that it would be a relatively easy thing to determine whether this is residential property or not, whether it's cropland or not. You have a building on it or you don't. Or I'd go so far as to say maybe if they're in the process of constructing a building. Maybe even if there were roads put in and sidewalks and this is part of the process. But nothing's happened other than they've thought about it. I mean, there's been no indicia of building at all, is there? Well, you know, that's interesting because when plaintiff purchased the land, there was a lot 303 in Deer Trail that had a partially constructed home on it. All right? He sold that property and that home then was eventually, you know, was sold or the home was completed. I'm sorry. So, once again, that belies the really residential nature of this. And I'd also point out, once again, Judge Adrian had the opportunity to actually view this property and hear these arguments. Counsel for the plaintiff made these arguments to Judge Adrian. But Judge Adrian had the ability or was fortunate to be able to use that property. Can you explain why this empty lot was residential? Well, once again, it does have residential type services. At least on some of these properties, there's utilities that run adjacent to them, alongside them. You also have utility services sometimes running within or through those particular parcels. Once again, houses aren't on those 14, but there are services. This court is very deferential, as they must be. The decisions, the trial court has to be contrary to the manifest way of the evidence. In this case, I suppose the difficulty is I don't understand what evidence there is to support the residential claim. I mean, I'm looking. I don't see it, counsel. The reason I'm harping on this point is I want to make sure I'm not confused here. I want to make sure that I understood fully what it is you're arguing. But it seems to me if there's no building or anything pertaining to a building even started, it's not residential. And I don't understand how under the statute it could be. I would also, if I may, Your Honor, just point the court also to what's in the record, showing from 2008 to the present, the marketing of these lots as residential. Well, that's a good point, because I want to make sure I understand that, too. So, let's assume we have farmland that the person, Mahramzad, has now bought or sold, is intending to develop into a platted subdivision near Panther Creek here, where expensive homes are being built on, bought up some portion of a farm. And he's offering to sell it to people in platted spots. But it's still just growing corn. Does that make it residential property? Is that your argument? If he's done absolutely nothing to the property, Your Honor, it's still remaining farmland. If he wants to develop it into a subdivision... I described what he's done. He's advertised it, but that's what you just said. Well, no, because we still have to go back in the history of this. This land was purchased initially in a 420-acre tract. What's your authority for looking at the history? That's what I keep going back to. Remember, we've got some sort of hard facts, law. Section 1.60, we're talking about the primary purpose, whether or not it's residential. Are you familiar with the Santa Fe case? Yes, Your Honor. It's been briefed. The Santa Fe case teaches us we look to the present use of the land. So we've got authority to look to the present use of the land, and I hear this argument over and over about the contemplated or wished-for use of the land, which we're all working towards development of. I think you've convinced the court they'd like to sell this land and see it be residential. But we're looking at the present use. We're looking at the primary purpose, unless you provide some other authority for us to use. I want to give you an opportunity to answer Justice Kavanaugh's question. We've extended your time, but I wanted to give you a chance to answer this if you wish. Sure. Well, with regard, I know that the Santa Fe case, we have distinguished that in our briefs, Your Honor. In that particular case, there was no dispute that the land previously had been farmed for or had been involved in farming for many, many years prior to that situation arising. But I understand that language does say current use. Okay. Thank you, counsel. Mr. Turpin, do you have any rebuttal, sir? No rebuttal, Your Honor. Thank you, counsel. We'll take this round of advisement. The court will stand in the recess.